1   WILLIAM L. STERN (CA SBN 96105)
    WStern@mofo.com
2   CLAUDIA M. VETESI (CA SBN 233485)
    CVetesi@mofo.com
3   CLAIRE C. BONELLI (CA SBN 317735)
    CBonelli@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California  94105-2482
    Telephone: 415.268.7000
6   Facsimile: 415.268.7522

7   VIRGINIA MARCELA CHOI (CA SBN 294659)
    Vchoi@mofo.com
8   MORRISON & FOERSTER LLP
    707 Wilshire Boulevard
9   Los Angeles, California  90017-3543
    Telephone: 213.892.5200
10  Facsimile: 213.892.5454

11  Attorneys for Defendant
    UNILEVER UNITED STATES, INC.
12

13              UNITED STATES DISTRICT COURT

14              CENTRAL DISTRICT OF CALIFORNIA

15                  SOUTHERN DIVISION

16

17  KAYLEE BROWNING and SARAH          Case No. 8:16-CV-2210-AG-KES
    BASILE, on behalf of themselves and
18  all others similarly situated,         **DEFENDANT UNILEVER UNITED
                                           STATES, INC.'S REPLY BRIEF IN
19                    Plaintiffs,          SUPPORT OF MOTION FOR
                                           SUMMARY JUDGMENT, PARTIAL
20          v.                             SUMMARY JUDGMENT, OR TO
                                           STRIKE CLASS AVERMENTS**
21  UNILEVER UNITED STATES, INC.,
22                    Defendant.           Hearing Date: August 20, 2018
                                           Time:         10:00 a.m.
23                                         Judge:        Hon. Andrew J. Guilford
                                           Ctrm:         Courtroom 10D
24
                                           Action filed:  December 16, 2016
25

26

27

28

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ...................................................................................1

II.   PLAINTIFFS' FACTUAL UNTRUTHS DEBUNKED ...........................2

    A.   Plaintiffs' Theory of Omission, Explained. ..........................................3

    B.   The Real Facts.......................................................................................4

        1.   The Real Story of Micro-Tears: An Internet Hoax. ..................4

        2.   The Real Story:  It is Undisputed that Unilever Did Substantiate the Safety of the St. Ives Products. ........................9

        3.   The Real Story:  Unilever Did an Extensive Investigation. ..... 11

        4.   The Real Story:  A Tiny Number of Consumer Complaints. ........................................................................... 11

        5.   The Real Story:  Debunking the "Jagged Edges" Canard. ....... 13

III.  ARGUMENTS IN REPLY ................................................................... 13

    A.   Plaintiffs' Challenge to Unilever's Safety Studies Is a Disguised "Substantiation" Claim, Which is Barred by *Kwan v. SanMedica*. ......................................................................................... 13

    B.   There Is No Factual Dispute About Plaintiffs' "Omission" Claim. ................................................................................................. 15

        1.   Reason No. 1:  There is No Genuine Disputed Fact Issue Over Harm. ........................................................................... 15

        2.   Reason No. 2:  There is No Genuine Disputed Fact Issue Over The Cause, Namely, That WSP Causes Damage. ........... 16

        3.   Reason No. 3:  The Presence of WSP in the Scrub Does Not Give Rise to a Duty to Disclose as a Matter of Law. ........ 18

        4.   Reason No. 4:  Product Reviews and Awards. ......................... 20

        5.   Reason No. 5:  Plaintiffs Lack Standing Under *Williams*. ....... 20

    C.   There Is No Factual Dispute About "Dermatologist Tested." ............ 21

    D.   The Court Should Enter Partial Summary Judgment on Plaintiffs' Injunctive Relief Claim. ................................................... 22

    E.   The Parties Agree About The Two Products in Issue. ........................ 23

    F.   The Court Lacks Jurisdiction Over the Claims of Ms. Basile and the New York Subclass. ..................................................................... 23

1

IV.   CONCLUSION ........................................................................................... 25

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Azoulai v. BMW of N. Am. LLC*,
    No. 16-CV-00589-BLF, 2017 WL 1354781 (N.D. Cal. Apr. 13,
    2017) ................................................................................................22

*Birdsong v. Apple, Inc.*,
    590 F.3d 955 (9th Cir. 2009) ..............................................................20

*Bristol-Myers Squibb Co. v. Super. Ct.*,
    137 S. Ct. 1773 (2017) ...............................................................*passim*

*Burrell v. Cty. of Santa Clara*,
    No. 11–CV–04569–LHK, 2013 WL 2156374 (N.D. Cal. May 17,
    2013) ................................................................................................16

*Chassin Holdings Corp. v. Formula VC Ltd.*,
    No. 15-CV-02294-MEJ, 2016 WL 1569986 (N.D. Cal. Apr. 19,
    2016) ................................................................................................25

*Chavez v. Church & Dwight Co.*,
    No. 17 C 1948, 2018 U.S. Dist. LEXIS 82642 (N.D. Ill. May 16,
    2018) ................................................................................................24

*Clemens v. DaimlerChrysler Corp.*,
    534 F.3d 1017 (9th Cir. 2008) ............................................................21

*In re Clorox Consumer Litig.*,
    894 F. Supp. 2d 1224 (N.D. Cal. 2012) ...............................................14

*Davidson v. Kimberly-Clark Corp.*,
    873 F.3d 1103 (9th Cir. 2017), *as amended at* 889 F.3d 956 (9th
    Cir. 2018) .....................................................................................22, 23

*DeBernardis v. NBTY, Inc.*,
    No. 17 C 6125, 2018 U.S. Dist. LEXIS 7947 (N.D. Ill. Jan. 18,
    2018) ................................................................................................24

*Fisher v. Cty. of Orange*,
No. CV 16–01866–CJC, 2018 WL 1036847 (C.D. Cal. Feb. 14,
2018) ...................................................................................................... 16

*Gen. Bus Sys. v. N. Am. Philips Corp.*,
699 F.2d 965 (9th Cir. 1983) ............................................................... 17

*Greene v. Mizuho Bank, Ltd.*,
289 F. Supp. 3d 870 (N.D. Ill. 2017)................................................... 24

*Hodsdon v. Mars, Inc.*,
891 F.3d 857 (9th Cir. 2018) ............................................................... 19

*Kwan v. SanMedica Int'l.*,
854 F.3d 1088 (9th Cir. 2017) ............................................... 13, 14, 15

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*,
624 F.3d 1083 (9th Cir. 2010) ....................................................... 16, 21

*Lanovaz v. Twinings N. Am., Inc.*,
726 F. App'x 590 (9th Cir. 2018)........................................................ 23

*McDonnell v. Nature's Way Prods., LLC*,
No. 16 C 5011, 2017 U.S. Dist. LEXIS 177892 (N.D. Ill. Oct. 26,
2017) ...................................................................................................... 24

*Michelle Robinson et al. v. Unilever United States, Inc.*,
No. 17-3010 (C.D. Cal. filed Apr. 21, 2017) ECF No. 30 ........................24fn. 24

*Min Sook Shin v. Umeken, U.S.A., Inc.*,
No. CV 17–00315–CJC, 2017 WL 6885380 (C.D. Cal. Oct. 26,
2017) ...................................................................................................... 14

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
457 F.3d 963 (9th Cir. 2006) ............................................................... 16

*Practice Mgmt. Support Servs. v. Cirque Du Soleil, Inc.*,
No. 14 C 2032, 2018 U.S. Dist. LEXIS 39754 (N.D. Ill. Mar. 12,
2018) ................................................................................................. 24, 25

*Route v. Mead Johnson Nutrition Co*,
No. CV 12–7350–GW, 2013 WL 658251 (C.D. Cal. Feb. 21, 2013)................ 14

*Sims v. Kia Motors America, Inc.*,
    No. CV 13-1791 AG, 2014 WL 12558251 (C.D. Cal. Oct. 8, 2014) ........... 19, 20

*Sonner v. Schwabe North Am. Inc.*,
    231 F. Supp. 3d 502 (C.D. Cal. 2017) ................................................................. 15

*Williams v. Yamaha Motor Co.*,
    851 F.3d 1015 (9th Cir. 2017) .................................................................... 19, 20

*Yeager v. Bowlin*,
    693 F.3d 1076 (9th Cir. 2012) ............................................................................ 22

**Other Authorities**

Fed. R. Civ. P.
    12(g)(2) ............................................................................................................. 23
    8(a)(2) ................................................................................................................ 16
    56(c)(2) ................................................................................................................. 2

Stephanie Montes, How St. Ives Apricot Scrub is Destroying Your
    Skin, The Zoe Report (Mar. 10, 2016),
    http://thezoereport.com/beauty/skincare/st-ives-apricot-scrub-is-
    destroying-your-skin/ ........................................................................................... 7

Ben Johnson, MD, LinkedIn, https://www.linkedin.com/in/ben-
    johnson-md-34655311/ ........................................................................................ 6

Ben Guarino, Iowa Attorney General: Drinkable Sunset 'Flat-out
    Dangerous to Consumers,' The Washington Post (Mar. 16, 2017),
    https://www.washingtonpost.com/news/morning-
    mix/wp/2017/03/16/iowa-attorney-general-drinkable-sunscreen-
    flat-out-dangerous-to-
    consumers/?noredirect=on&utm_term=.2c49b3f9176f ....................................... 6

## I.   INTRODUCTION

The central claim in this case is that the walnut shell powder (WSP) used as the exfoliant in the St. Ives Apricot Scrub products causes skin damage, called micro-tears.  This notion began as an internet hoax.  Curiously, Ms. Browning and Ms. Basile never had a problem with the Products despite decades of use, that is, not until counsel showed them five blog posts that repeated the decades-old canard.  Plaintiffs sued and quoted those blog posts in their Complaint.  They got past the motion to dismiss.

In April, Unilever moved for summary judgment.  As for Plaintiffs' principal claim, micro-tears, Unilever showed there is no such thing.  The term has never been cited in a single journal of dermatology.  Unilever also attached declarations from four of the bloggers who repudiated the statements the Complaint attributes to them.[1]  As for the secondary claim, "Dermatologist Tested," Plaintiffs deposed the principal investigator of the safety studies Unilever commissioned.  She is a "dermatologist."  The statement is therefore true.

That's when things unraveled.  In their Opposition, Plaintiffs have now abandoned the Complaint's two pillars: (i) WSP causes micro-tears, and (ii) "Dermatologist Tested" actually means "Dermatologist Recommended."  But what they offer in place is no better.  If anything it is worse, and raises no fact issues.

Gone are micro-tears.  That was a lexical misunderstanding, we are now told, because Plaintiffs meant to say WSP causes "disruption to the stratum corneum."  Gone too are the five bloggers.  Instead, Plaintiffs offer a real medical doctor.  But even if the Court were to consider Dr. Nestor's declaration,[2] his opinion does

---

[1] The fifth failed to show up at her deposition.

[2] Dr. Nestor's declaration raises troubling questions.  (*See* Declaration of Mark S. Nestor, ECF No. 107-3.)  Plaintiffs failed to timely disclose Dr. Nestor and his report before filing their Opposition, refused to supplement their interrogatory

(Footnote continues on next page.)

Plaintiffs no good.  The Complaint describes one condition, whereas Dr. Nestor identifies a very different condition altogether.  A claim not pled cannot create a fact issue.  Worse, Dr. Nestor doesn't support the Complaint's crucial averment that the Products "are unfit to be sold as a facial scrub."  He never says this.

As for "Dermatologist Tested," the Opposition describes a very different "Dermatologist Tested" claim, one that is not only unpled, it is different than what both Ms. Browning and Ms. Basile said in deposition.  Which means we now have three meanings.  That flip-flop aside, it is Plaintiffs' burden on this motion to show that "an appreciable number of reasonably prudent purchasers exercising ordinary care'" would believe that "Dermatologist Tested" carries the meaning they ascribe.  How can there be a single meaning when Plaintiffs themselves can't agree on what it is?  Even if Plaintiffs had a single meaning for "Dermatologist Tested" and had pled it, they still need "reasonable person" evidence.  They have none.

The Court should enter summary judgment.

## II.  PLAINTIFFS' FACTUAL UNTRUTHS DEBUNKED

In its opening brief, pages 6-8, ECF No. 61 ("Memorandum or Mem."), Unilever showed there is no such thing as micro-tears.[3]  Never mind that Plaintiffs' entire complaint is built on putting users at risk of micro-tears.  The Court agrees: "Plaintiffs allege that the Product ***isn't fit to be sold as a facial scrub*** because crushed walnut shells—the Product's primary exfoliating ingredient—***causes micro-tears*** in the skin."  (Order Granting in Part and Denying in Part Defendant's

---

(Footnote continued from previous page.)

responses (which falsely state they are relying on the five bloggers), and concealed Dr. Nestor despite knowing his identity and the substance of his report weeks before their Opposition fell due—all despite Unilever's repeated requests and proposals.  Unilever has filed a separate motion to strike under Rule 56(c)(2).

[3] Plaintiffs allege that "micro-tears" is damage to the skin that "may not be immediately noticeable to the naked eye, [but] it nonetheless leads to acne, infection and wrinkles."  (Compl. ¶ 3.)

1    Motion to Dismiss, ECF No.25, at 3 (citing "Compl., Dkt. No. 1 ¶ 3") (emphasis

2    added).)  As late as March 9, 2018, Plaintiffs insisted in sworn discovery responses

3    that micro-tears were real and that the warnings of the bloggers quoted in the

4    Complaint were genuine.[4]

5        Not anymore.  Unilever moved for summary judgment, debunked the micro-

6    tears myth, and produced sworn declarations from the bloggers.  Plaintiffs now

7    concede their micro-tears attack is indefensible because there is no such medical

8    condition (Plaintiffs' Opposition to Defendant's Motion for Summary Judgment,

9    ECF No. 107 ("Opp.") at 14:6-8 ("'microtears' is simply 'a non-medical term[.]")

10   and have abandoned their reliance on the bloggers.  (*Id.* at 8 n.2.)

11       No matter, we are now told, micro-tears was just a lexical mix-up.  It is a

12   term that lay people attach to a condition doctors call "disruption to the stratum

13   corneum."  (*Id.* at 14:6-8.)  The damage is real (*id.* at 14:9-11) they tell us, and, by

14   whatever name, it is this risk that Unilever concealed and they are suing over.

15       Just as Plaintiffs had to invent a fictional medical condition to suit their

16   theory of harm, so have they now, in their Opposition, invented facts to fit their

17   theory of omission.  This section refutes that narrative.

18     **A.**    **Plaintiffs' Theory of Omission, Explained.**

19       Plaintiffs' omission theory goes like this:  Unilever (and its predecessor,

20   Alberto Culver) ███████████████████████████—this based

21   on "articles" and consumer complaints (Opp. at 18:10-20); Unilever never placed a

22   "warning" on its labels and the "dial" icon is "laughable" (*id.* at 19:18-25);

23   ████████████████████████████████████████

---

24        [4] In their March 9, 2018 responses to Unilever's contention interrogatories,

25   Plaintiffs identified the five blog posts cited in the Complaint as their sole basis for
their statement that WSP causes damage to the skin:  "Plaintiff's factual contentions

26   supporting the statement that 'crushed walnut shell(s), "which has jagged edges …
cause micro-tears in the skin when used in a scrub' and 'leads to acne, infection and

27   wrinkles.'" *are those asserted in paragraphs 5-11 of the Complaint*."  (ECF No.
61-5 at 4:14-17 (emphasis added); *see also* ECF No. 61-6 at 4:14-17.)

28

1   ███████████████████████████████████████████" (*id*. at 9:9-16); no one "ever

2   contacted the dermatologists quoted in articles about the dangers of St. Ives" (*id*. at

3   9:7-8); instead, Unilever regarded "the articles and consumer complaints as a purely

4   public relations issue that could be solved with spin alone" (*id*. at 9:5-7); and,

5   finally, ████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ██████████████████████████ (*Id*. at 9:16-19.)

8       Like the internet hoax on which this case is built, every part of this account is

9   made up.  The next section exposes this.

10  **B.    The Real Facts.**

11      **1.    The Real Story of Micro-Tears: An Internet Hoax.**

12      Plaintiffs say Exhibits 47 and 48 (Stern Decl., Exs. J, K) show that "████████

13  ████████████████████████████████████████████████████

14  ████████████████████████████ (Opp. at 18:8-20 (emphasis added);

15  see also 13:8-12.)  Let's take a closer look.

16      *First*, neither exhibit mentions skin damage.  That part is made up.

17      *Second*, there are no consumer complaints.  To the contrary, Exhibit 47 says

18  that ██████████████████████████████████████████████████████████

19  ██████████████████████████ (Deposition of Jeff Wolcheski, Stern Decl. Ex. B

20  ("Wolcheski Dep."), 178:3-16.)  ████████████████████████████████████

21  ██████████ (*Cf*. Stern Decl., Ex. 47.)

22      *Third*, Plaintiffs cite Exhibit 47 for the notion that WSP became so toxic that

23  ██████████████████████████████████████████████████████ (Opp. at

24  18:12-14; 26:15-19.)  Yet, importantly, that never happened.  Indeed, even today

25  WSP is listed as an ingredient.  (Compl. ¶ 2.)  Unilever's Jeff Wolcheski[5]

26  ────────────────────

27      [5] Mr. Wolcheski is one of Unilever's two "30(b)(6)" witnesses.  The other is
    Suzanne Palentchar.

28

explained:  WSP is "essentially the star ingredient of the formula, so we would want [consumers] to know that walnut was in there." (Wolcheski Dep. at 179:16-180:1.)  If this is Plaintiffs' notion of concealment, listing WSP as the second ingredient (after water)—not to mention its marketing as the hero ingredient of the products—is an odd way to stage a cover-up.

Plaintiffs insist micro-tears are real because ████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████ (Opp. at 13:8-12.)  This is circular.  People talk about zombies, but that doesn't make them real.

Still, Unilever pleads guilty to having looked into harshness and micro-tears in 2014,[6] and admits that the issue was brought to the company's attention by an outside public relations firm whose job was monitoring consumer feedback on social media.  (Palentchar Dep. at 143:7-20.)  But that doesn't mean Unilever regarded "the articles and consumer complaints as a purely public relations issue that could be solved with spin alone." (Opp. at 9:5-7.)  To the contrary, in 2014, Unilever "determined there was no issue" only after reviewing the safety tests from 2010.  (Palentchar Dep. at 143:21-144:2.)  Those 2010 safety studies were ███████████████████████████████████████ ██████████  The 2010 industry-standard safety studies are found at ECF Nos. 62 and 62-1.[7]  As for "spin," it is true Unilever prepared draft talking points (*see* Stern Ex.

---

[6] The investigation wasn't limited to micro-tears.  It was looking into harshness in general, by any other name.  ((Deposition of Suzanne Palentchar, Stern Decl. Ex A ("Palentchar Dep.") at 147:17-19.)

[7] Plaintiffs deposed the consulting dermatologist of those studies, Dr. Anita Cham—a dermatologist.  Like every medical professional in this case, Dr. Cham never heard of the term micro-tears.  She never studied the condition at the University of Pennsylvania Medical School and in 38 years of clinical practice had never encountered that condition.  She never heard the term until this case.

(Footnote continues on next page.)

F), but these were never issued (Palentchar Dep. at 209:12-15)—another cover-up that happened only in Plaintiffs' imaginings.

Facts notwithstanding, internet hoaxes have a way of persisting, and micro-tears rumors surfaced again in 2016.  As before, it started with blog posts, and, once again, Unilever investigated.  Two blog posts are worth calling out.

Consider Exhibits 11 (Stern Ex. E) and 50 (Kopel Ex. 50).  Class counsel questioned Mr. Wolcheski about these exhibits to try to show Unilever's knowledge of the supposedly serious danger posed by these scrubs.  Neither exhibit says that.

Exhibit 11 is a series of internal company emails circa September 2015 prompted by the public relations agency's sending of a blog post on shefinds.com. There, an anonymous author wrote:  "St. Ives Apricot Scrub is the worst product you could use on your skin" and, as her sole evidence, she cites to a "Dr. Ben Johnson" who, in turn, was quoted in a blog called "Bustle."  (*See* Stern Decl., Ex. E.)  Mr. Wolcheski looked up Dr. Johnson during his deposition and quickly found that gentleman's LinkedIn page.  (Wolcheski Dep. at 197:19-199:9.)[8]  Dr. Johnson, it turns out, is the President of "Osmosis Pur Medical Skincare."  To be sure, he has a Medical Doctorate—in "Aesthetic Medicine."  When he is not selling a competing scrub, Dr. Johnson is off inventing; he has a product that reverses aging and an invention called "drinkable sunscreen"—which, last year, the Iowa Attorney General sued him over, alleging consumer fraud.[9]  Exhibit 11, nevertheless, is one

(Footnote continued from previous page.)

(Deposition of Anita Cham ("Cham Dep.") at 68:23-69:19, attached to Stern Declaration as Ex. C.)

[8] *See* Ben Johnson, MD, LinkedIn profile, https://www.linkedin.com/in/ben-johnson-md-34655311/ (last visited July 31, 2018).

[9] *See* Ben Guarino, Drinkable Sunset 'Flat-out Dangerous to Consumers, The Washington Post (Mar. 16, 2017), https://www.washingtonpost.com/news/morning-mix/wp/2017/03/16/iowa-attorney-general-drinkable-sunscreen-flat-out-dangerous-to-consumers/?noredirect=on&utm_term=.2c49b3f9176f (last visited July 31, 2018).  This article also says that Dr. Johnson lost his license to practice in Colorado (where he lives) in 2001.

of the "news articles" Plaintiffs say proves Unilever's actual knowledge that WSP causes skin damage.

Exhibit 50 is similar, a series of internal company emails starting in March 2016 prompted by a blog published in the Zoe Report.[10]  Plaintiffs cite it because, there, Mr. Wolcheski says: ███████████████████████████████████ ████████████████████████████ (Opp. at 9:15-16.)   From this, Plaintiffs darkly conclude that Unilever did no investigation.   Reading the Opposition Brief, one would be excused in thinking Exhibit 50 actually supports Plaintiffs' accusation.  What does Exhibit 50 actually tell us?

First, the claim that Unilever did no investigation and "responded to the articles and consumer complaints as a purely public relations issue" (Opp. at 9:5-7) is made up.  Mr. Wolcheski went on to testify that it was precisely *this blog post* that prompted Unilever to *undertake* its investigation.  Second, following that months-long investigation, the company concluded that Exhibit 50 is "basically a beauty blogger report that is not scientifically credible."  (Wolcheski Dep. at 199:20-22.)

Plaintiffs never pinpoint the supposedly incriminating "news articles" they say put Unilever on notice of this supposedly dangerous condition.  (*See* Opp. at 8:5-9:18.)  If they mean Exhibits 11 and 50, their reliance is misplaced.  These aren't news articles.  If they evidence anything, these blog posts simply mark another chapter in the internet hoax that started in ███████ typical of the kind of micro-tear accusations Unilever's R&D team has to field.  (Wolcheski Dep. at 199:10-16.)

Exhibit 50 (the Zoe Report) is particular germane.  On October 15, 2016, Ms. Palentchar convened a meeting with the "cross-functional team" that for six months

---

[10] *See* https:/ /thezoereport.com /beauty/skincare/st-ives-apricot-scrub-is-destroying-your-skin/.

1    had investigated micro-tears and harshness.  The team concluded there is no safety

2    risk.  At that meeting, Ms. Palentchar described her frustration over "micro tears"

3    as "they're a unicorn, right?  That's like – that you can't prove they don't exist

4    because you can't see them because they don't exist."  (Palentchar Dep. at 149:20-

5    25.)

6        Still, the hoax wouldn't go way.  Two months after Unilever debunked the

7    Zoe Report blog, Plaintiffs cited that very post in footnote 5 of their Complaint as

8    proof that St. Ives' scrubs damage the skin.  As Plaintiffs put it:  "An aesthetician

9    explained that '[t]he main ingredient in this scrub is walnut shell.  The abrasive

10   texture created microscopic tears in the top layer of the skin, which then increases

11   future redness and inflammation."  (Compl. ¶ 9.)  In short, this lawsuit is—quite

12   literally—an internet hoax transcribed onto 28-line pleading paper.

13       Plaintiffs never spoke to the five bloggers.[11]  Unilever did, and four of

14   them—including Stephanie Montes, the author of that blog—reject Plaintiffs'

15   attributions.  (Mem. at 11:14-20.)  This time, at least, facts won.  On April 30,

16   2018—just six weeks after Plaintiffs swore under oath that their only evidence to

17   support their "WSP causes micro-tears" claim was the five bloggers cited in the

18   Complaint (*see* footnote 3, above)—Plaintiffs called it "absurd" to think they are

19   relying on those bloggers.  (*Cf.* ECF No. 74-1 at 6:22-23 ("Defendant refers to

20   people quoted in the complaint as Plaintiffs' 'experts.' . . . . That is absurd.").)  And

21   in their Opposition, Plaintiffs have (in a footnote) quietly dispatched the bloggers.

22   (*See* Opp. at 8 n.2.)

23       Facts matter.  As the Court said in its prior ruling, "whether or not Plaintiffs'

24   allegation—that crushed walnut shells renders a product unfit as a facial scrub—is

25   based on "junk science" is relevant at a later stage of litigation, such as in a motion

26   _____

27   [11] It is odd indeed for Plaintiffs to fault Unilever for not contacting the "dermatologists quoted in articles about the dangers of St. Ives."  (Opp. at 9:7-9.)

28

for summary judgment." (ECF No. 25 at 4.) This is summary judgment.

### 2. The Real Story: It is Undisputed that Unilever Did Substantiate the Safety of the St. Ives Products.

Plaintiffs assert that Unilever dismissed micro-tears as a public relations problem and did no testing. (Opp. at 9:5-7; 9:16-19.) They are mistaken.

*First*, the company prepared draft messages, but it also considered ignoring the bloggers and not inflaming the internet trolls. As Ms. Palentchar made clear, however, the chief concern was consumer safety. (Palentchar Dep. at 162:12-163:5.)

*Second*, Alberto Culver conducted two industry-standard safety studies in 2010 under the direction of a dermatologist, Dr. Cham.[12]



[13] (*See* ECF Nos. 62 and 62-1.)

(Cham Dep. at 87:2-6.)

*Third*, Alberto Culver performed a 2010 clinical study under the direction of a different investigator. (*See* Ex. D.)

---

[12] Both studies used the Shelanski method, which is a standard protocol used in the industry to measure a product's or ingredient's safety. Dr. Cham didn't invent the protocol. It has been around for decades. (Cham Dep. at 70:3-24.)

[13] "Erythema" just means redness.

1  █████████████████████████████████████████

2  ████████████████████████  (*Id.* at 8.)  If ██████████████████

3  ████████████████████████, how can it be "unfit to be sold as a scrub"?

4      *Fourth*, Plaintiffs' latest theory misunderstands biology and scrubs.  The

5  stratum corneum is about 20 cell layers deep and consists of dead cells waiting to

6  be sloughed.  (Wolcheski Dep. at 24:24-25:3.)  A scrub acts only on the top layer.

7  (Cham Dep. at 81:8-20.)  ██████████████████████████████

8  ██████████████████████████████████████████

9  (*Id.* at 82:4-10.)  Not surprisingly, Plaintiffs do not advance a bacterial theory.

10      *Fifth*, there is common sense.  Anyone who has used a wash cloth or a loofah

11  has doubtless observed redness afterward.  Both have an exfoliant effect similar to

12  St. Ives scrubs.  (Cham Dep. at 84:18-85:7.)  And who hasn't shaved and afterward

13  experienced dry skin—what Dr. Nestor calls trans-dermal water loss?  Are we to

14  stop shaving?  "The reality is almost everyone's stratum corneum is impaired in

15  some way or another."  (Wolcheski Dep. at 18:1-3.)  And as Dr. Cham teaches, it

16  doesn't matter because skin repairs itself in 28 days.  (Cham Dep. at 83:8-13.)

17      *Sixth*, Plaintiffs separately (and inconsistently) mention "over-exfoliation," as

18  if this is how skin damage occurs.  (Opp. at 14:8-10.)  Over-exfoliation is using the

19  product improperly, contrary to the "Directions" that counsel three to four times a

20  week.  (*Cf.* Compl. ¶ 2; *see also* Palentchar Dep. at 179:8-18 ("Look, if someone

21  used our product 24 hours a day, seven days a week, that would be going against

22  our recommendation.")  Used as directed, the scrub cannot penetrate the stratum

23  corneum (Cham Dep. at 82:4-10); "neither the walnut shell or the surfactants in

24  there are going to remove more than a couple of the upper layers of the stratum

25  corneum" (Wolcheski Dep. at 202:2-5); and one would not expect TEWL trans-

26  epidermal water loss from normal use of the scrub.  (*Id.* at 171:23-172:2; *accord*

27  Cham Dep. at 83:4-7.)

28      Plaintiffs' "over-exfoliation" theory is a contradiction.  It asks this Court to

impose a duty to warn because of a possible risk to consumers who use the product *incorrectly*.  They may as well hold liable the manufacturer of a Phillips screw driver for failing to warn:  "Do not use as a Q-tip."

### 3.    The Real Story:  Unilever Did an Extensive Investigation.

Plaintiffs say Unilever did no investigation.  This is also contrary to fact.  We just described how, in 2014, the company reviewed the 2010 safety studies and concluded there was no risk of damage.

In March 2016, as just discussed, more blogs surfaced that mentioned micro-tears, so Unilever assembled a cross-functional team to investigate.  The team included marketing, R&D, supply chain, and legal.  (Palentchar Dep. at 147:14-16; 155:5-156:4; 203:14-205:22.)  They undertook a multi-pronged investigation:  (i) Gathering and reviewing the now *five* safety studies (there were additional studies in 2015 and 2016)[14]; (ii) checking the WSP supplier to make sure nothing had changed (*id*. at 156:4; 203:14-205:22); (iii) asking several dermatologists if micro-tears exist[15]; (iv) conducting a literature search, which found no mention of micro-tears (Wolcheski Dep. at 60:22-61:18); and (v) ███████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████  (Wolcheski Dep. at 62:2-8; Ex. 45.)

### 4.    The Real Story:  A Tiny Number of Consumer Complaints.

Another falsehood that gets repeated in the Opposition is the notion that

─────────────────────

[14] ████████████████████████████████████████████ ████████████████████████

[15] Plaintiffs contend that Unilever never talked to a dermatologist.  (Opp. at 9:7-9.)  They are wrong.  The marketing team asked its consulting dermatologist, ████████████████████████████████████████ 2), plus ██████████████████████████████████████████  (Wolcheski

1 ███████████████████████████████████████████████████████

2 ████████████ (Opp. at 2:3-5; 9:11-13; 18:18-20) or, as they put it, ████████

3 ██████████████████ (*Id.* at 8:16-19.)  This is also fiction.

4   Plaintiffs point to Exhibit 49, which is a page from an internal PowerPoint

5 presentation dated August 4, 2016 (Stern Decl., Ex. N).  It discusses complaints,

6 but this is not a large volume. ██████████████████████████████████

7 ███████████████████████████████ (Wolcheski Dep. at 180:16-

8 181:17.)  Despite that low threshold, the issue of consumers complaining about

9 micro-tears or harshness has never been escalated.  (*Id.*)  The █████████

10 threshold has never been breached.  The absence of escalation means this issue has

11 never been a concern to consumers.  (*Id.*)

12   This conclusion is corroborated by St. Ives apricot scrub having won the

13 ALLURE magazine Reader's Award for 13 years in a row.[16]  As Mr. Wolcheski says,

14 "it just seems impossible that you could win an award that many times through a

15 very popular magazine like this, based on consumer polling, if there was a real

16 issue with the product."  (*Id.* at 194:3-17.)  Even Ms. Browning agrees.  She admits

17 that this poll of 40,000 readers having given St. Ives the award all these years is

18 inconsistent with what she would expect if consumers had actually experienced the

19 skin injury she alleges.  (Browning Dep., ECF No. 71 at 100:25-101:16.)

20   It is not just ALLURE either.  As we showed in the opening memorandum,

21 pages 14-15, the St. Ives Apricot Scrub products won CLEO's Reader's Choice

22 awards, SEVENTEEN's "The Besties" awards, and TEEN VOGUE's Reader's Choice

23 awards.  The products have also been reviewed by thousands of consumers on

24 websites in which the average customer review on Amazon, CVS, Target, Walmart,

25 _____

26 [16] Plaintiffs say this should be disregarded because Unilever pays ALLURE a royalty for displaying its logo.  (Opp. at 9 n.3.)  But Unilever didn't pay ALLURE

27 for the *award*, and Unilever did not influence the vote.  (Palentchar Dep. at 202:19-24.)

28

and Walgreens is approximately 4.5 or higher out of 5.

          **5.**      **The Real Story:  Debunking the "Jagged Edges" Canard.**

No theory of harm is complete without a mechanism to explain why.  So, the last piece in Plaintiffs' jigsaw puzzle is the claim that WSP in the Products has "jagged edges."  (Opp. at 6:1-7:4; *see also* Compl. ¶ 3 ("crushed walnut shell … has jagged edges that cause micro-tears.").)  This contention is also untrue.

Plaintiffs' argument turns on Exhibit 46 (Stern Decl., Ex. I),

(Wolcheski Dep. at 176:6-11.)

The real facts are found in Exhibit 45 (Stern Decl., Ex. H).  This is the report prepared by Unilever's lab.

(*Cf. id.*)

(Wolcheski Dep. at 62:15-18.)

## III.   ARGUMENTS IN REPLY

     **A.**    **Plaintiffs' Challenge to Unilever's Safety Studies Is a Disguised "Substantiation" Claim, Which is Barred by *Kwan v. SanMedica*.**

In its opening memorandum, Unilever predicted that Plaintiffs might attack Unilever's safety studies.  If so, that "would be tantamount to a 'prior

1  substantiation' claim, which Plaintiffs lack standing to bring." (Mem. at 18:20-19:5

2  (citing *Kwan v. SanMedica Int'l.*, 854 F.3d 1088 (9th Cir. 2017)).)

3       We were correct.  Plaintiffs challenge the adequacy of Unilever's safety

4  studies, hoping to create a fact issue through a battle-of-experts.  For example, they

5  criticize ███████████████████████████████████████████████████████████

6  ██████████████████████ (Opp. at 10:1-11:20), and the CES test as "likewise useless"

7  because ██████████████████████████████████████████ (*Id*. at 11:22-

8  13:5.)  Unilever, they say, should have "tested whether St. Ives cause stratum

9  corneum impairment."  (*Id*. at 9:20-21.)  And their expert, Dr. Nestor, has an even

10  longer list of substantiation crimes.  (*See* Nestor Decl. ¶¶ 40-43.)

11       All these arguments are precluded.  In *Kwan*, a consumer brought a UCL

12  claim against an over-the-counter supplement manufacturer alleging that it made

13  false claims about its human growth hormone supplements.  The Ninth Circuit

14  affirmed the district court's dismissal, finding this was nothing more than a

15  "failure-to-substantiate" claim that, as a matter of law, only the Attorney General

16  and District Attorneys may bring.  *Id.* at 1096 (citing *Nat'l Council Against Health

17  Fraud v. King Bio Pharm., Inc*., 107 Cal. App. 4th 1336, 1344-45 (2003)

18  ("[P]rivate plaintiffs are not authorized to demand substantiation for advertising

19  claims").)  Thus, even if Unilever had done *no* testing, Plaintiffs would still lose.

20       Claims that rest on lack of adequate substantiation are not cognizable.  *In re

21  Clorox Consumer Litig*., 894 F. Supp. 2d 1224, 1232 (N.D. Cal. 2012) (collecting

22  cases); *see also Route v. Mead Johnson Nutrition Co*, No. CV 12–7350–GW, 2013

23  WL 658251, at *4 (C.D. Cal. Feb. 21, 2013) (rejecting "battle of experts" and

24  dismissing claims against baby food manufacturer alleging that defendant lacked

25  adequate substantiation to support prebiotic claims).  As Judge Carney wrote

26  recently, citing *Kwan*:  "Plaintiff cannot bring a lack of substantiation claim as a

27  matter of law."  *Min Sook Shin v. Umeken, U.S.A., Inc.*, No. CV 17–00315–CJC,

28  2017 WL 6885380, *8 n.12 (C.D. Cal. Oct. 26, 2017) (dismissing with prejudice

class action claims against a dietary supplement manufacturer alleging that defendant's substantiation was inadequate).

Plaintiffs never cite *Kwan.*  They will say *Kwan* is inapplicable because this is an omission claim and they allege deception.  No matter.  *Kwan* also declined to allow plaintiff's alternative claim, brought under the UCL as deception—exactly the claim asserted here.  854 F.3d at 1098; *see also Sonner v. Schwabe North Am. Inc.*, 231 F. Supp. 3d 502, 512-13 (C.D. Cal. 2017).

Plaintiffs' attack on the adequacy of Unilever's safety testing is at the heart of all of their claims, because it is the foundation of their concealment and omission theory.  Those attacks fail.  *Kwan* controls.

### B.  There Is No Factual Dispute About Plaintiffs' "Omission" Claim.

In its opening memorandum, Unilever showed there was no fact dispute over Plaintiffs' omission claim for five reasons.  (Mem. at 6:1-15:25.)  This remains true.

### 1.  Reason No. 1:  There is No Genuine Disputed Fact Issue Over Harm.

Micro-tears don't exist.  So, whether or not WSP causes something, it can't cause micro-tears.  Even Plaintiffs do not contend there is such a medical condition.  Rather, they now say micro-tears is synonymous with "disruption to the stratum corneum" and that's the harm they meant all along.  This argument fails.

*First*, these aren't just synonyms for the same condition.  Plaintiffs describe a condition that is not "noticeable to the naked eye."  (*See* Compl. ¶ 3.)  Dr. Nestor describes a condition called "disruption to the stratum corneum" that produces *visible* redness, which *can* be seen to the naked eye.  (*Cf.* Nestor Decl., Appendix 3 at 19.)[17]  It is undisputed that Ms. Browning and Ms. Basile had no observable

---

[17] Curiously, although Dr. Nestor's relies on "photographs taken on each visit by the VISIA™ Complexion Analysis System and OMNIA™ Imaging System to track visual progression of their appearances," no such photographs are included with his report. (*See* Nestor Decl. ¶ 33.)

effects and, in deposition, they described a condition they claim to have suffered but "couldn't see."  (*Cf.* Plaintiffs' Statement of Genuine Disputes of Material Fact, ECF No. 107-2 ¶ 5.)  They cannot have experienced the condition that Dr. Nestor describes.

*Second*, sprained ankles and strained tendons may seem similar, but they are two very different medical conditions.  So too here.  The Complaint alleges that WSP causes one form of skin damage, and now, for the first time in their Opposition, Plaintiffs posit a different condition: "disruption to the stratum corneum."  This violates the rule that Plaintiffs "may not effectively amend [their] Complaint by raising a new theory [ ] in [ ]response to a motion for summary judgment."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010); *see also Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (allegations not included in the complaint failed to "give the defendant fair notice of what the plaintiff's claim [were] and the grounds upon which [they] rest[ed]," as required by Rule 8(a)(2) of the Federal Rules of Civil Procedure); *Fisher v. Cty. of Orange*, No. CV 16–01866–CJC, 2018 WL 1036847, at *10 (C.D. Cal. Feb. 14, 2018) (plaintiff could not raise new factual allegations at summary judgment); *Burrell v. Cty. of Santa Clara*, No. 11–CV–04569–LHK, 2013 WL 2156374, at *11 (N.D. Cal. May 17, 2013) (refusing to consider claims raised for the first time on summary judgment).

> **2.  Reason No. 2:  There is No Genuine Disputed Fact Issue Over The Cause, Namely, That WSP Causes Damage.**

Even if the Court were to accommodate Plaintiffs' about-face, they have no evidence that the Products (or WSP) *cause* physical harm to the skin or that the presence of WSP renders the Products unfit for a facial scrub.

To start, Plaintiffs have abandoned the five bloggers cited in their Complaint.  They won't be submitting those statements.  (ECF No. 107-2 ¶ 2.)

What about physical evidence?  Plaintiffs' theory is that WSP has jagged

edges, but there are no disputed facts. Unilever's ████████████████████

Exhibit 45, and Mr. Wolcheski's unrebutted testimony, establishes that nothing

about the shape of the WSP particles ████████████████████

████████████████████ (Wolcheski Dep. at 62:15-

18.) Plaintiffs' "jagged edge" hypothesis is gone, and without a causal agent to

explain the supposed damage caused by WSP, Plaintiffs lose.

Not so fast, they will say, what about our expert, Dr. Nestor? They still lose.

A plaintiff must offer "significant probative evidence *tending to support the*

*complaint*." *Gen. Bus Sys. v. N. Am. Philips Corp.*, 699 F.2d 965, 971 (9th Cir.

1983) (emphasis added). Here, the averment Plaintiffs make is: "St. Ives is not fit

to be sold as a facial scrub." (Compl. ¶ 3.) That is the averment they must prove—

and for every claim no less, because Plaintiffs repeat that refrain in each claim for

relief. (*See id.* ¶ 11 ("St. Ives is unfit to be sold or used as a facial scrub. The

product is completely worthless"); *see also id.* ¶¶ 18, 19, 38, 55, 64, 68, 71, 77, 87

("St. Ives is not fit to be used as a facial scrub because it causes skin damage").[18]

Dr. Nestor never says that. Rather, he says:

> I conclude that use of St. Ives when used as directed leads
> to facial skin irritation and impaired barrier function.
> ***Because I believe that the facial skin irritation and***
> ***impaired barrier function problems outweigh any***
> ***benefit associated with use of St. Ives as directed, I***
> ***would advise my patients against using the product as a***
> ***facial scrub.***

(Nestor Decl. ¶ 2 (emphasis added.) That isn't good enough.

The discredited bloggers at least supported the Complaint's averment that the

---

[18] This Court agrees. In its MTD Order, the Court characterized Plaintiffs' charging allegation thus: "Plaintiffs allege that the Product ***isn't fit to be sold as a facial scrub*** because crushed walnut shells—the Product's primary exfoliating ingredient—causes micro-tears in the skin." (ECF No. 25 at 3 (emphasis added); *see also id.* at 4 (reliance properly pled because "Plaintiffs allege that they relied on the *omission* that the Product ***isn't fit to be used as a facial scrub*** when they purchased it and that they wouldn't have purchased it if they had been aware of that omission"; *id.* at 6 (warranty claims properly pled "since Plaintiffs do indeed allege that the Products were ***unfit for use as facial scrubs*** . . . .")

1   St. Ives scrubs were not fit to be sold.  Dr. Nestor does not.  He never says the

2   products are unfit to be sold.  He applies a risk/benefit analysis by which each

3   consumer (or their doctor) must balance the risk of skin damage against the benefit

4   (e.g., acne treatment).  In applying that approach, he says he would advise *his*

5   patients not to use the product.  Others—someone with a significant acne

6   condition—might come out differently under Dr. Nestor's risk/benefit analysis.

7        Moreover, lots of products that would flunk a risk/benefit test are

8   nevertheless fit to be sold.  Suppose I am on a diet and decide not to order dessert?

9   Or, that I choose not to bike to work because I might get hit by a car.  That doesn't

10  mean the chocolate cake or the bike aren't fit to be sold.  Dr. Nestor's risk/benefit

11  approach is not evidence of an across-the-board failure of the Products to perform

12  as facial scrubs, rather, it relegates "fitness" to individual decision-making and

13  consumer choice.  He offers no evidence that the Products fail across-the-board,

14  that the Products are "unfit to be sold as a facial scrub."

15       There is no genuine factual dispute.  Plaintiffs have failed to meet their

16  burden of proving that the presence of WSP renders the products unfit to be sold.

17  **3.     Reason No. 3:  The Presence of WSP in the Scrub Does Not**
    **Give Rise to a Duty to Disclose as a Matter of Law.**
18

19       In its opening memorandum, Unilever showed that it had no duty to disclose

20  because an "unreasonable safety hazard" can never arise from a medical condition

21  that doesn't exist. (Mem. at 11:23-14:10.)  Plaintiffs' latest epiphany—"disruption

22  to the stratum corneum"—fares no better.  Let's start with what has been discussed

23  already.

24       *First*, this attempted switch is an improper attempt to amend the Complaint.

25       *Second*, even assuming the Court were to allow this new theory, it doesn't

26  create a fact issue.  Plaintiffs disagree and insist there is an "unreasonable safety

27  hazard" and that the presence of WSP affects the Products' "central function"

28  because use of the scrubs causes a significant increase in dryness and redness and

1  "a compromised skin barrier function and impaired stratum corneum" can expose

2  "persons to a host of health risks, including dry and irritated skin and infections."

3  (Opp. at 16:1-19.)  They are wrong about both prongs.

4        The Opposition describes a condition that is worlds apart from the

5  "unreasonable safety hazard" demanded in *Williams v. Yamaha Motor Co.*, 851

6  F.3d 1015, 1029 (9th Cir. 2017) and the "central function" prong of *Hodsdon v.*

7  *Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018).  Here, the Complaint alleges that the

8  Products cause one condition, whereas Dr. Nestor identifies a very different

9  condition.  The latter cannot create a fact issue that is unpled.  Moreover, the new

10  theory, as expressed by Dr. Nestor, doesn't support the Complaint's averment that

11  the Products are unfit to be sold as a facial scrub.  Nor can Plaintiffs' "*over-*

12  exfoliation" theory fill the void.  Whereas the Complaint assumes damage from

13  using the Products as directed, *over*-exfoliation presupposes the Products are

14  misused.  In any event, it is undisputed that (i) the Products' exfoliation effect is no

15  different than shaving or using a wash cloth or loofah, and (ii) skin heals itself in 28

16  days anyway.

17        In its opening memorandum, page 14, Unilever showed that all three

18  *Williams* rationales apply because here, as in *Williams*: (i) Our class representatives

19  have not experienced the complained-of event; (ii) Unilever "expressly warns" of

20  the risk through its ingredient list and its "dial" icon ("deep" exfoliant); and (iii) if

21  the *life-threatening* risk of "onboard fires"' and "loss of steering power" was not a

22  "safety" risk, it is hard to imagine how this condition qualifies.

23        Perhaps the more relevant precursor is this Court's decision in *Sims v. Kia*

24  *Motors America, Inc.*, No. CV 13-1791 AG, 2014 WL 12558251 (C.D. Cal. Oct. 8,

25  2014), in which plaintiffs alleged that a design defect in the cars' gas tanks

26  increased the risk they could become dislodged and ignite in a collision.  This Court

27  dismissed with prejudice, in part, because the amended complaint alleged just one

28  exploding gas tank incident.  In *Sims*, at least, there was one real incident of

damage (three deaths) from the alleged risk.  Here, there are none, not even the class representatives.  Moreover, in *Sims* the alleged cause (ill-designed gas tanks) at least affected all owners.  Here, under Plaintiffs' new theory, there is no inherent lack of fitness, rather, it depends on each individual's risk/benefit calculus.

### 4.      Reason No. 4:  Product Reviews and Awards.

If Plaintiffs' hypothesis were correct, one would have seen a flood of consumer complaints.  Instead, there was only a dribble, ███████████ ████████████████████████████████  As for awards and online product reviews, Plaintiffs do not mention this at all, aside from the ALLURE award.  The Court could assume from Plaintiffs' silence that they have no answer.

### 5.      Reason No. 5:  Plaintiffs Lack Standing Under *Williams*.

In its opening memorandum, page 15, Unilever explained that an asymptomatic class representative who has not herself experienced injury cannot sue for failing to disclose safety risks:  "[A] party's allegations of an unreasonable safety hazard must describe more than merely 'conjectural and hypothetical' injuries." *Williams*, 851 F.3d at 1028-29.  Plaintiffs disagree and contend the Court has already held they have standing based on *economic* injury.  Plaintiffs misunderstand *Williams*.

The issue is not economic versus personal injury.  *Williams* was also an economic injury case.  The issue is symptomatic or not.  *Williams* holds that if you are going to sue on an omission theory based on a duty to disclose, you must be symptomatic.[19]  This Court's MTD Order did not address *Williams*, which had not been decided.

There is no genuine fact dispute that Plaintiffs are asymptomatic.[20]

---

[19] This requirement also holds for warranty claims.  *See Birdsong v. Apple, Inc.*, 590 F.3d 955, 959 (9th Cir. 2009).

[20] In their Separate Statement, Plaintiffs admit they observed no symptoms despite decades of use.  (*Cf.* ECF No. 107-2 ¶ 5.)

### C.    There Is No Factual Dispute About "Dermatologist Tested."

The Complaint alleges that "Dermatologist Tested" is "ambiguous" because "Defendant omits the fact that St. Ives … is not *recommended* by dermatologists." (Compl. ¶ 12.)  In its opening memorandum, 15:26-17:28, Unilever showed that Plaintiffs do not challenge the actual verb "Tested." Unilever also showed that the two class representatives offer two very different meanings of that phrase.  Ms. Basile thinks "Dermatologist *Tested*" means "Dermatologist *Approved.*" Ms. Browning disagrees; she doesn't think "tested" means "approved."  She knows the label doesn't say "Dermatologist Recommended."  Her position is that it should.

Things only got worse.  After Unilever filed its motion, which attached two safety tests overseen by Dr. Anita Cham—a dermatologist—Plaintiffs deposed Dr. Cham and several Unilever <u>witnesses</u>.  Plaintiffs discovered that Unilever had done a total of *four* safety tests, each overseen by a "dermatologist."  What did Plaintiffs do?

Plaintiffs repudiated Paragraph 3.  (*Cf.* Opp. 22:27-23:3 ("Plaintiffs' claims … are not premised on interpreting 'Dermatologist tested' as "Dermatologist Recommended'.")  And in their Separate Statement, they even "dispute" Unilever's *verbatim* quote of Paragraph 3.  (*Cf.* ECF No. 107-2 ¶ 3.)  Instead, their Opposition describes a very different "Dermatologist Tested" claim, one they didn't plead. (Opp. at 21:1-24:12.)  As with micro-tears, this is a disguised motion to amend. The Court should reject it.  *Cf. La Asociacion de Trabajadores*, 624 F.3d at 1089. If it did, Plaintiffs' failure to defend their averment warrants rejection of the "Dermatologist Tested" claim altogether.

Even if the Court were to entertain the rogue amendment, Plaintiffs lack evidence that "an appreciable number of reasonably prudent purchasers exercising ordinary care'" would believe that "Dermatologist Tested" carries the meaning they ascribe.  *See Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008).  Instead, they say it is "self-evident" and "common sense" that "reasonable

1    consumers would be misled by Unilever's failure to disclose the harm that St. Ives

2    causes to users' skin."  (Opp. at 23:14-16.)  Plaintiffs are saying, in effect, "Trust

3    us, we don't need evidence."  This isn't law, it is levitation.[21]

4          Finally, it is undisputed that Ms. Basile's purchase decision had nothing to do

5    with the label, hence, she cannot have relied on it.  (*See* Mem. at 19:8-21.)

6    Plaintiffs dispute this because Ms. Basile has filed a contradictory declaration

7    saying she did rely on the "Dermatologist Tested" statement.  (ECF No. 107-6 ¶ 3.)

8    That is not allowed.  *Yeager v. Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) ("a

9    party cannot create an issue of fact by an affidavit contradicting his prior deposition

10   testimony.")

11        **D.     The Court Should Enter Partial Summary Judgment on Plaintiffs'**

12        **        Injunctive Relief Claim.**

13        In its opening memorandum, Unilever showed that both Plaintiffs stopped

14   purchasing the Products (Browning Dep., 26:14-21; Basile Dep., 22:7-9) and there

15   can be no "repetition" because there will be no purchase decision to influence.

16   Plaintiffs disagree, tendering two new declarations saying they would buy again so

17   long as the risk were eliminated, citing *Davidson v. Kimberly-Clark Corp.*, 873

18   F.3d 1103 (9th Cir. 2017), *as amended at* 889 F.3d 956 (9th Cir. 2018).  This is

19   insufficient.

20        First, the Court should reject the declarations.  *Yeager*, 693 F.3d at 1080.

21   Second, they make no sense.  And Ms. Browning stopped using the Product not

22   because of any skin irritation but because she got it in her eye.  (Browning Dep.,

23   26:14-21; 38:11-15.)  Third, *Davidson* is distinguishable.  That was a pleading case

24   in which plaintiff affirmatively alleged she would purchase the product in the

25   _____

26        [21] The reasonable consumer test also applies to warranty claims. *See, e.g., Azoulai v. BMW of N. Am. LLC*, No. 16-CV-00589-BLF, 2017 WL 1354781, at *7

27   (N.D. Cal. Apr. 13, 2017) (warranty claims "require a showing that alleged statements or omissions are 'likely to deceive' reasonable consumers").

28

future.  *Davidson*, 873 F.3d at 1116; *see Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590, 591 (9th Cir. 2018) (A 'profession of an inten[t] ... is simply not enough' to satisfy Article III.")  This case is at the summary judgment stage and, aside from the new self-contradictory declarations, the facts are undisputed.

### E.   The Parties Agree About The Two Products in Issue.

Plaintiffs have now clarified that this lawsuit applies to just two products: St. Ives Fresh Skin Apricot Scrub and St. Ives Acne Control Apricot Scrub.  (Opp. at 31:17-21.)  There is no disagreement over products.

### F.   The Court Lacks Jurisdiction Over the Claims of Ms. Basile and the New York Subclass.

In its Opening Brief, Unilever established that this Court lacks personal jurisdiction as to the claims of Ms. Basile and the New York Subclass pursuant to *Bristol-Myers Squibb Co. v. Super. Ct.*, 137 S. Ct. 1773 (2017) ("*BMS*").[22] Plaintiffs argue that Unilever has waived its personal jurisdiction defense and that *BMS* does not apply to the claims of nonresident class members.  (Opp. at 32-35.) They are wrong on both counts.

Unilever did not waive its personal jurisdiction defense because it was not "available" to Unilever when it filed its Answer.[23]  *See* Fed. R. Civ. P. 12(g)(2). While the decision did not "invent[] the concept of specific jurisdiction," (Opp. at 32) *BMS* nonetheless changed the law of personal jurisdiction.  As one court explained it:

> "[a]lthough styled as a 'straightforward application . . . of settled principles of personal jurisdiction,' 137 S. Ct. at 1783, *Bristol-Myers* resolved an open question on which lower courts had split: whether,

[22] Plaintiff admits to all relevant facts concerning Ms. Basile's residency, where Ms. Basile purchased the product, and Unilever's state of incorporation and principal place of business.  (*See* ECF No. 107-2 ¶¶ 1-2.)

[23] Unilever filed its Answer on May 17, 2017; *BMS* was not decided until June 19, 2017.

> absent a 'connection between [a state] and the specific claims' brought by a nonresident plaintiff against a defendant not subject to general jurisdiction in that state, a court may nevertheless exercise specific personal jurisdiction over those claims because they are similar or identical to claims brought in the same case by a resident plaintiff against the same defendant."

*Greene v. Mizuho Bank, Ltd.*, 289 F. Supp. 3d 870, 873 (N.D. Ill. 2017).

For this reason, courts have typically declined to find arguments premised on *BMS* to have been waived (or have excused any waiver).  *See, e.g.*, *Practice Mgmt. Support Servs. v. Cirque Du Soleil, Inc.*, No. 14 C 2032, 2018 U.S. Dist. LEXIS 39754, at *50-52 (N.D. Ill. Mar. 12, 2018) (permitting defendants to raise *BMS* argument as part of class certification opposition because "[d]efendants raise[d] their personal jurisdiction defense in a motion that timely followed the Supreme Court's decision in *Bristol-Myers* making that defense available to them"); *Chavez v. Church & Dwight Co.*, No. 17 C 1948, 2018 U.S. Dist. LEXIS 82642, at *25 n.11 (N.D. Ill. May 16, 2018).[24]

Plaintiffs' argument that *BMS* does not extend to class actions is a silly argument.  There is only one due process clause as affects personal jurisdiction.  By Plaintiffs' reckoning, there would be two:  one for "mass tort" cases and another for class actions.  That is why courts applying *BMS* to bar the claims of nonresident putative class members recognize that *BMS* involved a mass tort but nonetheless conclude that the decision's *reasoning* applies with equal force to the class action context.  *See McDonnell v. Nature's Way Prods., LLC*, No. 16 C 5011, 2017 U.S. Dist. LEXIS 177892, at *10-11 (N.D. Ill. Oct. 26, 2017); *DeBernardis v. NBTY, Inc.*, No. 17 C 6125, 2018 U.S. Dist. LEXIS 7947, at *6 (N.D. Ill. Jan. 18, 2018);

---

[24] Plaintiffs make much of the fact that Unilever continued to engage in discovery after *BMS* was decided.  But Unilever raised its *BMS* argument at the first reasonable juncture—the filing of this dispositive motion.  In fact, in another case involving Unilever in this district, the Court recently decided that a personal jurisdiction argument premised on *BMS* could not be considered until after discovery.  *See Michelle Robinson et al. v. Unilever United States, Inc.*, No. 17-3010 (C.D. Cal. filed Apr. 21, 2017) ECF No. 30.

1  *Cirque Du Soleil*, 2018 U.S. Dist. LEXIS 39754, at *47 ("[I]t [is] not clear how

2  [Plaintiff] can distinguish the Supreme Court's basic holding in *Bristol-Myers*

3  simply because this is a class action.").

4  Finally, Plaintiffs ask the Court to exercise pendent personal jurisdiction over

5  the claims of Ms. Basile.  But that doctrine is typically employed to enable a district

6  court to consider state law claims where personal jurisdiction is already established

7  as to federal claims in the same complaint.  *See Chassin Holdings Corp. v. Formula*

8  *VC Ltd.*, No. 15-CV-02294-MEJ, 2016 WL 1569986, at *9 (N.D. Cal. Apr. 19,

9  2016).  It is not, as Plaintiffs suggest, a means of circumventing a fundamental

10  principle of due process—that a defendant cannot be subjected to a court's

11  jurisdiction when "the conduct giving rise to the nonresidents' claims occurred

12  elsewhere."  *BMS*, 137 S. Ct. at 1782.

13  **IV.  CONCLUSION**

14  For all the foregoing reasons, the Court should enter summary judgment or

15  partial summary judgment on the five claims and legal theories discussed.

16

17  Dated:    August 6, 2018                MORRISON & FOERSTER LLP

18                                          By:  /s/ *William L. Stern*

19                                               WILLIAM L. STERN

20                                               Attorneys for Defendant
                                                 UNILEVER UNITED STATES, INC.

21

22

23

24

25

26

27

28